# STATE OF MICHIGAN

# COURT OF APPEALS

TAMIKA STAPLETON,

       Plaintiff-Appellant,

v

AUTO CLUB INSURANCE ASSOCIATION,

       Defendant,

and

DALE A. DECARLO and DESIGN CEILING &
PARTITION, INC.,

       Defendants-Appellees,

and

LATOYA JOHNSON,

       Defendant.

UNPUBLISHED
December 18, 2014

No. 317701
Macomb Circuit Court
LC No. 2013-001816-NI

Before: RIORDAN, P.J., and BECKERING and BOONSTRA, JJ.

PER CURIAM.

      In this action to recover damages under the no-fault act, plaintiff, Tamika Stapleton, appeals as of right from the trial court's order granting summary disposition to defendants Dale A. DeCarlo and Design Ceiling & Partition, Inc. pursuant to MCR 2.116(C)(10), and dismissing the case against all defendants. We reverse and remand for further proceedings.

I.  PERTINENT FACTS AND PROCEDURAL HISTORY

On March 26, 2010, DeCarlo was driving a van owned by Design Ceiling & Partition when he rear-ended a car being driven by defendant LaToya Johnson, and plaintiff was her passenger.  Plaintiff went to the hospital shortly after the accident, where she was diagnosed with abdominal wall contusions, cervicalgia,[1] and unspecified injuries.  Plaintiff's x-rays at the time were described as "normal."

On or about March 30, 2010, plaintiff sought treatment from Dr. John Mufarreh, a chiropractor.  She presented with complaints including upper back pain, lower back pain, and pain in her left shoulder and arm.  Dr. Mufarreh's examination revealed decreased cervical and lumbar range of motion and he diagnosed plaintiff with a muscle spasm.  Dr. Mufarreh issued a disability certificate opining that plaintiff was disabled from employment, performing housework, caring for certain personal needs, and driving.  In May 2010, an MRI of plaintiff's left shoulder indicated "supraspinatus tendonitis" and "down-sloped acromion process [ ] that may be associated with extrinsic impingement."  An MRI of plaintiff's lumbar spine was normal, and the MRI of her cervical spine indicated "[m]inimal degenerative changes at C4/C5," but "[o]therwise, normal MRI of the cervical spine."  In June 2010, neurologist Dr. Nilofer Nisar performed an EMG, which revealed "electrodiagnostic evidence of C5 and L5 radiculopathy[2] involving the left upper and lower extremity, along with irritability of cervical and lumbrosacral paraspinal muscles."  Dr. Nisar noted that plaintiff "has a lot of difficulties to turn around during the EMG examination because of pain.  The strength is slightly reduced all over."  Dr. Nisar observed that plaintiff had "[p]osttraumatic neck and back pain, status-post motor vehicle accident March 26, 2010."

Plaintiff continued to see Dr. Mufarreh, who wrote disability certificates for plaintiff, concluding that plaintiff was disabled from housework and caring for her personal needs such as dressing or any activity that involved lifting or twisting, from March 2010 through November 2011.  In addition, Dr. Mufarreh declared plaintiff disabled from work and from driving from March 2010 until June 2010, indicating that as of June 22, 2010, plaintiff could drive and return to work "as needed."  Plaintiff received disability payments during her time off from work.

In September 2010, plaintiff was referred to and began treating with orthopedic surgeon Dr. Stephen Mendelson.  At the time, she complained of pain in her neck and left shoulder.  Dr. Mendelson reported that plaintiff could raise her left arm, but could not raise it past 90 degrees.  Dr. Mendelson recommended physical therapy for plaintiff.  Plaintiff returned to Dr. Mendelson in October 2010.  An ultrasound revealed "significant tendinosis" and a "functional impingement."  Dr. Mendelson gave plaintiff a cortisone injection.

---

[1] Cervicalgia is defined simply as "neck pain."

[2] "Radiculopathy is a generic term referring to a dysfunction in a nerve, generally pertaining to the nerve root at the spine."  *Chouman v Home Owners Ins Co*, 293 Mich App 434, 443 n 6; 810 NW2d 88 (2011).

In March 2011, plaintiff saw Dr. Mendelson once again for her shoulder pain. She reported that she had been back to work, but reported back pain and shoulder pain. Dr. Mendelson treated plaintiff with another cortisone injection.

In June 2011, plaintiff saw Dr. Mendelson's partner, Dr. Martin Kornblum. Dr. Kornblum reported that plaintiff had "full range of motion of the neck" and "full range of motion of the shoulders with some pain in the left shoulder." Dr. Kornblum reported that "[t]here is negative impingement today" and that plaintiff did not display "weakness" or "atrophy." Plaintiff still reported back, neck, and shoulder pain at the time of the examination. Dr. Kornblum listed his impression of plaintiff's condition as "[c]ervical and lumbar and thoracic pain," and he ordered MRI's of plaintiff's thoracic and lumbar region. A June 23, 2011 MRI of plaintiff's lumbar-sacral spine revealed "[d]isc bulges at the L3-4, L4-5 and L5-S1 levels, impinging upon the thecal sac and causing mild-to-moderate bilateral neurofoaminal narrowing." An MRI of the thoracic spine, taken on the same date, revealed a disc bulge at the "T10-11 level, indenting upon the ventral thecal sac."

Plaintiff saw Dr. Mendelson in September 2011 and complained of pain in her left shoulder and neck. Plaintiff reported to Dr. Mendelson that "up until about a month ago she was having very little pain in the shoulder, but that pain recurred for her." Dr. Mendelson took note of the MRI's and administered another cortisone injection into plaintiff's shoulder. Dr. Mendelson noted that if plaintiff did not achieve or sustain improvement, he would pursue other options, including arthroscopic surgery on her shoulder. In October 2011, following another visit with plaintiff, Dr. Mendelson listed his impression of plaintiff as "[l]eft shoulder rotator cuff tendonitis." Dr. Mendelson ordered physical therapy for plaintiff.

On December 9, 2011, plaintiff saw Dr. Kornblum and reported that she was having "ongoing pain involving her lower back area" and that her neck was "stiff." At the time, she was participating in physical therapy for her shoulder and reported to Dr. Kornblum that she wanted to participate in physical therapy for her lower back as well. Dr. Kornblum diagnosed plaintiff with "[c]ervical and lumbar pain" and prescribed continued physical therapy. He also prescribed a TENS unit for plaintiff.

On December 16, 2011, plaintiff saw Dr. Mendelson for follow-up care of her left shoulder. Dr. Mendelson reported that plaintiff believed physical therapy was helping her. Dr. Mendelson maintained his diagnosis of "[l]eft shoulder rotator cuff tendonitis" and renewed her physical therapy.

On December 19, 2011, plaintiff saw Dr. Anthony Oddo, another partner of Dr. Mendelson. She complained of back pain and neck pain that caused, among other issues, difficulty sleeping. Dr. Oddo reported that plaintiff "is able to forward flex, but has pain that forward flexion in the past is [sic] 75 degrees. Extension also causes pain in the low back. . . ." Dr. Oddo listed his impression of plaintiff's condition as "[c]hronic pain due to trauma," sacroilitis, low back pain, and neck pain. Dr. Oddo recommended injections and physical therapy, with possible other options down the line.

In her February 23, 2012 deposition, plaintiff testified that, due to her injuries, she did not work for approximately three months after the accident. At the time of her deposition, plaintiff continued to have pain in her left shoulder, neck, and back, but reported that she did not have any limitation on her ability to perform her job. She admitted that no doctor had given her a prognosis for her pain. She testified that before the accident, she did not have any neck, back, or shoulder pain. Because of the accident, she could not lift "a certain amount of weight," and she could not raise her left arm all the way above her head. Plaintiff testified that, before the accident, she played tennis with her daughter about once per week, ran on a track near her house about twice per week, and practiced yoga and Pilates twice per week, but that she could not engage in these activities after the accident because of her injuries. In addition, plaintiff testified that her husband had to help her dress, get in and out of the bathtub, and help her with stairs. Plaintiff further testified that she was unable to do household chores. Plaintiff last received payments for attendant care and replacement services in June 2010.

Plaintiff filed this lawsuit in June 2011, and on May 2012, defendants DeCarlo and Design Ceiling & Partition moved for summary disposition under MCR 2.116(C)(10), arguing that plaintiff could not demonstrate a serious impairment of a body function under MCL 500.3135. The case, which was originally filed in Wayne Circuit Court, was transferred to Macomb Circuit Court in August 2012. After delays caused by the transfer, the trial court granted summary disposition in June 2013. The trial court concluded that plaintiff failed to demonstrate a genuine issue of material fact on whether she suffered a serious impairment of a body function. The trial court concluded that "[n]one of the medical evidence submitted indicates that plaintiff's important body functions have been so seriously impaired that her general ability to live her normal life has been altered." In reaching this conclusion, the trial court noted plaintiff's deposition testimony about being unable to run, play tennis, or lift a certain amount of weight over her head, but concluded that this testimony was contradicted by a report from Dr. Mufarreh that noted plaintiff's lifestyle was "unremarkable," and that for recreation, plaintiff reported that she "read[s]." According to the trial court, Dr. Mufarreh's report "indicates that at the time of the accident these activities which plaintiff claims are impaired were not much a part of her normal life." The trial court also concluded that, although plaintiff testified in her deposition that her daughter and her husband helped her with household chores, there was no indication that the help they provided went beyond the housework they would normally perform. "Most importantly," according to the trial court's written opinion, was that plaintiff's May 2010 MRI showed no injury, as did a report from her "orthopedic surgeon"—presumably Dr. Kornblum—"more than one year after the accident" showing that her cervical and lumbar spine were "normal with no impingement, weakness or atrophy." The trial court concluded by reasoning, "although plaintiff has sought and received treatment for *pain*, plaintiff has not provided evidence that there is a physical basis for that pain, or that it objectively diminishes her bodily functions such that she cannot live her normal life." The trial

-4-

court granted summary disposition to defendants DeCarlo and Design Ceiling & Partition.[3] This appeal followed.

## II. SUMMARY DISPOSITION

Plaintiff first argues on appeal that the trial court erred in granting defendants' motion for summary disposition under MCR 2.116(C)(10) after determining that her injuries did not amount to a "serious impairment of body function" under MCL 500.3135. We agree with plaintiff.

This Court reviews a trial court's decision regarding a motion for summary disposition de novo. *Coblentz v City of Novi*, 475 Mich 558, 567; 719 NW2d 73 (2006). A motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of a claim. *Skinner v Square D Co*, 445 Mich 153, 161; 516 NW2d 475 (1994). A motion for summary disposition under MCR 2.116(C)(10) should be granted if the pleadings, affidavits, and other documentary evidence, when viewed in a light most favorable to the nonmovant, show that there is no genuine issue with respect to any material fact. *Id.* See also MCR 2.116(G)(3) and (4).

Generally, the no-fault act abolishes tort liability arising from the ownership, maintenance, or use of a motor vehicle. *Grange Ins Co v Lawrence*, 494 Mich 475, 490; 835 NW2d 363 (2013). Under MCL 500.3135(1), however, "[a] person remains subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement." "[S]erious impairment of body function" means "an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life." MCL 500.3135(5).

## A. THRESHOLD INJURY

The question whether an injured person has suffered a serious impairment of body function is a question of law for the court if the court finds (1) that there is no factual dispute concerning the nature and extent of the person's injuries, or (2) that there is a factual dispute concerning the nature and extent of the person's injuries, but the dispute is not material to the determination of whether the person has suffered a serious impairment of body function. MCL 500.3135(2)(a); *McCormick v Carrier*, 487 Mich 180, 192-193; 795 NW2d 517 (2010). To establish a serious impairment of body function, there must be (1) an objectively manifested impairment (2) of an important body function that (3) affects the person's general ability to lead her normal life. *McCormick*, 487 Mich at 215.

Regarding whether the impairment was objectively manifested, our Supreme Court has explained that "an 'objectively manifested' impairment is commonly understood as one

---

[3] Defendants Auto Club Insurance and Latoya Johnson were dismissed on July 12, 2013, and are not parties to this appeal. Hereinafter, the word "defendants" only refers to DeCarlo and Design Ceiling & Partition.

observable or perceivable from actual symptoms or conditions." *Id.* at 196. The plain language of the statute requires that the "impairment" be objectively manifested, rather than the injury or symptoms. *Id.* at 197. Thus, the focus is not on the injuries themselves, but on how the injuries affected a body function. *Id.* The "objectively manifested" requirement is not met by pain and suffering, alone, but requires that plaintiffs introduce evidence establishing a physical basis for subjective complaints of pain and suffering. *Id.* at 198. Showing an impairment generally requires medical testimony. *Id.*

"If there is an objectively manifested impairment of body function, the next question is whether the impaired body function is 'important.' " *Id.* Whether a body function is important, meaning it "has great value, significance, or consequence[,] will vary depending on the person. *Id.* at 199 (quotation marks omitted). This prong is subjective and it requires a case-by-case inquiry, "because what may seem to be a trivial body function for most people may be subjectively important to some, depending on the relationship of that function to the person's life." *Id.*

If a person has suffered an objectively manifested impairment of an important body function, the last inquiry concerns whether the impairment "affects the person's general ability to lead his or her normal life." *Id.* at 200 (quotation marks omitted). "[T]he common understanding of to 'affect the person's ability to lead his or her normal life' is to have an influence on some of the person's capacity to live in his or her normal manner of living." *Id.* at 202. Making such a determination "necessarily requires a comparison of the plaintiff's life before and after the incident." *Id.* MCL 500.3135 "does not create an express temporal requirement as to how long an impairment must last in order to have an effect on 'the person's general ability to live his or her normal life.' " *Id.* at 203.

## B. APPLICATION

The trial court granted defendants' motion for summary disposition, finding there was no factual dispute concerning the nature and extent of plaintiff's injuries and that, as a matter of law, she had not suffered a serious impairment of an important body function. Having reviewed the evidence submitted by the parties, we conclude that material questions of fact existed concerning the nature and extent of plaintiff's injuries that were material to the determination of whether she suffered a serious impairment of an important body function under MCL 500.3135.

We agree with plaintiff that there was a question of fact concerning whether her injuries were objectively manifested. On the one hand, defendants note, as did the trial court, that plaintiff's x-ray results at Beaumont Hospital immediately after the accident were "normal." Nevertheless, plaintiff submitted medical records from Dr. Mufarreh, who diagnosed plaintiff with a muscle spasm on March 30, 2010. She also presented a letter from Dr. Mufarreh dated September 13, 2010, which indicated that plaintiff was diagnosed with a "subluxation of C2-C4/T4-T8/L3-L4/L5[-]S1, chronic muscle spasm cervical/lumbar, degenerative joint disease C4-C5, Radiculopathy C5 and L5 involving the left upper and lower extremity." Dr. Mufarreh provided plaintiff with disability certificates indicating that plaintiff was physically disabled from her employment and from housework for a period of time. Plaintiff also submitted MRI results from May 2010, showing tendonitis with impingement in the left shoulder and "minor degenerative changes" in the cervical spine. Additionally, plaintiff submitted an

-6-

"Electrodiagnostic Report" of Dr. Nisar, dated June 14, 2010, which revealed "electrodiagnostic evidence of C5 and L5 radiculopathy involving the left upper and lower extremity, along with irritability of cervical and lumbosacral paraspinal muscles." Dr. Nisar reported that plaintiff experienced "[p]osttraumatic neck and back pain, status-post motor vehicle accident March 26, 2010." Plaintiff also submitted the June 23, 2011 MRI results, which showed disc bulges at the "T10-11 level, indenting upon the ventral thecal sac" as well as disc bulges at the "L3-4, L4-5 and L5-S1 levels, impinging upon the thecal sac and causing mild-to-moderate bilateral neuroforminal narrowing." Furthermore, Dr. Mendelson reported that, as of September 2010, plaintiff could not raise her left arm past 90 degrees and Dr. Oddo reported that plaintiff experienced pain in moving her left arm past 75 degrees. Dr. Mendelson performed an ultrasound that revealed "significant tendinosis" and a "functional impingement."

We find that plaintiff presented sufficient evidence to create a genuine issue of material fact as to whether she suffered an objectively manifested impairment and a physical basis for her complaints of pain. The medical records noted above, particularly reports from Dr. Mendelson and Dr. Oddo, who reported that plaintiff was unable to move her left arm past a certain angle because of pain, create a genuine issue of material fact regarding an objectively manifested impairment that was observable by others. Dr. Mufarreh's chiropractic examination report also showed that plaintiff had a decreased range of motion in her neck and back on or about March 30, 2010, four days after the accident. In addition, Dr. Mufarreh provided disability slips for plaintiff after determining that she was unable to perform certain activities. Although the record contains evidence that plaintiff retained normal range of motion in approximately May or June of 2011, MCL 500.3135 "does not create an express temporal requirement as to how long an impairment must last in order to have an effect on 'the person's general ability to live his or her normal life.' " *McCormick*, 487 Mich at 203.

Defendants contend that plaintiff failed to present evidence that her injuries were caused by the accident. "Generally, proximate cause is a factual issue to be decided by the trier of fact" unless reasonable minds could not differ regarding the proximate cause of the plaintiff's injuries. *Nichols v Dobler*, 253 Mich App 530, 532; 655 NW2d 787 (2002). Here, plaintiff submitted an unsigned affidavit of Dr. Mufarreh, indicating that the subluxation, chronic muscle spasm, and radiculopathy were the result of the March 26, 2010 motor vehicle accident. However, an unsigned affidavit may not be considered by the trial court on a motion for summary disposition. *Gorman v American Honda Motor Co, Inc*, 302 Mich App 113, 120; 839 NW2d 223 (2013). Nonetheless, plaintiff submitted a report from Dr. Nisar, who noted that plaintiff had "[p]osttraumatic neck and back pain, status – post motor vehicle accident March 26, 2010." In addition, Dr. Oddo's December 19, 2011 report notes that plaintiff had "[c]hronic pain due to trauma." Furthermore, plaintiff presented her deposition testimony in which she testified that, before the accident, she had no injuries or problems with her neck, back, or shoulder. At a minimum, plaintiff presented sufficient evidence to create a genuine issue of material fact on the issue of causation.

In addition, there was a genuine issue of material fact concerning whether plaintiff's impairment was of an important body function[4] that affected her ability to lead her normal life. In finding that defendants were entitled to summary disposition, the trial court noted that Dr. Mufarreh's March 30, 2010 examination report indicated that plaintiff "reads" for recreation and that plaintiff's lifestyle was "unremarkable." In doing so, the trial court appears to have ignored plaintiff's deposition testimony, which indicated that, before the accident, plaintiff played tennis with her daughter about once per week, ran on a track near her house about twice per week, and practiced yoga and Pilates twice per week, and that she was unable to engage in these activities after the accident. In addition, there was record evidence that plaintiff did not work for approximately three months after the accident because of the pain she was experiencing. Determining whether a person has suffered an impairment that affected the person's ability to lead his or her normal life "necessarily requires a comparison of the plaintiff's life before and after the incident." *McCormick*, 487 Mich at 202. The evidence presented in this case presented a question of fact with respect to whether plaintiff was able to lead her normal life after the accident. The trial court in this case improperly made a factual determination that exercise and sports were not an important part of plaintiff's life before the accident by concentrating solely on the information contained in Dr. Mufarreh's March 30, 2010 examination report, and by ignoring plaintiff's deposition testimony to the contrary. A trial court is not permitted to assess credibility or determine facts when deciding a motion for summary disposition. *Skinner*, 445 Mich at 161. We therefore conclude that the trial court erred in granting summary disposition to defendants.

We note that the trial court's written opinion also emphasized that, "more than a year after the accident, plaintiff's orthopedic spine surgeon noted that her cervical and lumbar spine were normal with no impingement, weakness, or atrophy." However, plaintiff presented evidence, including disability certificates and her own deposition testimony, of her inability to work for a period of time, as well as an inability to exercise or perform certain household chores. In addition, MCL 500.3135 "does not create an express temporal requirement as to how long an impairment must last in order to have an effect on 'the person's general ability to live his or her normal life.' " *McCormick*, 487 Mich at 203. Therefore, the fact that a surgeon noted that plaintiff's cervical and lumbar spine were normal more than a year after the accident is not dispositive, as there is no requirement as to how long an important body function must be impaired. As such, we find there was a genuine issue of material fact with regard to whether plaintiff suffered a serious impairment of a body function.

Where questions of fact existed with respect to whether plaintiff suffered a serious impairment of body function, we conclude that the trial court erred in granting defendants' motion for summary disposition under MCR 2.116(C)(10).

---

[4] Defendants do not appear to contest whether the use of plaintiff's shoulders, neck, and back were important body functions; instead, they only contest whether plaintiff's ability to lead her normal life was affected.

III. WHETHER PLAINTIFF SHOULD HAVE BEEN PERMITTED TO FILE A
SUPPLEMENTAL BRIEF

Plaintiff next argues that the trial court erred in failing to allow her to submit a supplemental brief in response to defendants' motion for summary disposition. She alleges that she should have been able to present updated medical records that were generated after defendants filed their motion for summary disposition. Plaintiff provided no legal analysis or citation to authority to support her argument that the trial court erred in failing to allow a supplemental brief. In addition, the record does not contain any evidence that plaintiff attempted to file such a supplemental brief. Plaintiff has abandoned this issue on appeal by failing to provide legal analysis or citation of legal authority to support her position that she can assert error based on a supplemental brief she did not attempt to file. See *Houghton v Keller*, 256 Mich App 336, 339; 662 NW2d 854 (2003). Therefore, this Court will not address the issue.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Michael J. Riordan
/s/ Jane M. Beckering
/s/ Mark T. Boonstra